UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x

IN THE MATTER OF THE APPLICATION    :    AFFIDAVIT IN SUPPORT OF
                                         THE APPLICATION FOR
OF THE UNITED STATES OF AMERICA     :    SEARCH WARRANTS

FOR SEARCH WARRANTS FOR CERTAIN     :

PREMISES                            :    To Be Filed Under Seal

-----------------------------------x

STATE OF NEW YORK           )
COUNTY OF WESTCHESTER       : ss.:
SOUTHERN DISTRICT OF NEW YORK )

           HERBERT EIS, being duly sworn, deposes and says:

                        INTRODUCTION

           1.   I am a Special Agent of the Internal Revenue
Service ("IRS") and have been so employed for approximately
twenty-six years.  I am presently assigned to the Office of
Criminal Investigations, New York Field Office.  During my
employment with the IRS, I have participated in numerous tax fraud
investigations and have participated in the execution of several
search warrants.  I am the case agent assigned to this case.

           2.   This affidavit is being submitted in support of an
application for an order for the issuance of search warrants for
the following locations:

           (a)  Offices of Sneakerama, d/b/a Sneaker Mania,
Inc., Suite 803, 6 Xavier Drive, Cross County Shopping Center,
Yonkers, New York 10704 (the PREMISES #1);

(b)   Sneaker Mania, 1BB Xavier Drive, Cross County Shopping Center, Yonkers, New York 10704 including the basement storage area beneath that store (the PREMISES #2); and,

(c)   Sports Stop, 17 Xavier Drive, Cross County Shopping Center, Yonkers, New York 10704 including the basement storage area beneath that store (the PREMISES #3);

3.   I make this Affidavit based, in part, on personal knowledge as a result of my participation in this investigation and, in part, upon information and belief.  The sources of my information and belief are:

a.   Interviews of a confidential informant ("CI");

b.   Review of copies of records of the targets of the investigation, including:

(i) the corporate tax returns of Sneaker Mania, Inc., Pizza Mania, Inc., and Final Touch Jewelry, Inc.; (ii) the individual tax returns of Yehezkel Elia, an owner of the businesses; and (iii) partial copies of the actual books and records of Sneaker Mania, Inc., Sports Stop, Pizza Mania, Inc., Sneaker Mania Women and Kids, Dynasty, Sneaker Outlet, and Final Touch Jewelry Inc., that were provided by the CI; and,

c.   Conversations with inspectors of the United States Postal Inspection Service (USPIS) and records maintained by the USPIS.

2

4.    Because this Affidavit is being submitted for the limited purpose of obtaining search warrants, I have not set forth each and every fact learned during the course of this investigation.   Rather, the facts set forth below demonstrate that there is probable cause to believe that the PREMISES #1, #2, and #3 contain evidence of violations of Title 26, United States Code, Sections 7201, 7206(1) and Title 31, Section 5324.   Where I have set forth information learned from other sources, that information is set forth in substance and in part.

<u>Background of the Investigation</u>

5.    In general, Sections 6011 through 6012 of the Internal Revenue Code, and the regulations promulgated thereunder, require every corporation subject to federal taxation to file with the IRS each year, a return with respect to income, reporting, among other things, the total gross receipts earned by the corporation, and any deductions and credits to which the corporation was entitled.   Yehezkel Elia is the owner of numerous business establishments, including, among others: Sneakerama Inc. d/b/a Sneaker Mania, Inc., 1BB Xavier Drive, Cross County Shopping Center, Yonkers, New York;   Sneaker Mania Women and Kids, Cross County Shopping Center, 4 Mall Walk, Yonkers, New York; Dynasty, 1F Xavier Drive, Cross County Shopping Center, Yonkers, New York; Sports Stop, 17 Xavier Drive, Cross County Shopping Center, Yonkers, New York; Sports Stop, Galleria Mall, 100 Main Street, White Plains, New York, Sneaker Outlet, 38 Mamaroneck Avenue,

3

White Plains, New York, Pizza Mania, Inc., Cross County Shopping Center, 32 Mall Walk, Yonkers, New York; White Plains Driving School, DBA Center for Safety, 219 East Post Road, White Plains, New York; and Final Touch Jewelry, Inc., 24 Mall Walk, Cross County Shopping Center, Yonkers, New York. Elia has purported to report the receipts of these establishments on the following U.S. Corporation Income Tax Returns, Forms 1120: Sneaker Mania Inc., Pizza Mania, Inc., Final Touch Jewelry Inc. and White Plains Driving School, Inc. Based upon information derived in part from the CI and in part from my review of documents, there is probable cause to believe that Elia is significantly under-reporting his gross receipts and structuring financial transactions in order to evade the reporting requirements of financial institutions.

6. In or about March 2003, the CI approached the Government. According to the CI, the CI worked for Elia as a bookkeeper from in or about August 1999 through in or about February 2003, at Sneaker Mania's office located at the PREMISES #1.[1] The CI was the only employee who worked in the business office and was responsible for keeping the books and records of the following businesses: Sneaker Mania, Sneaker Outlet, Final Touch Jewelry, Dynasty, Pizza Mania, among others. Sneaker Mania,

_____

[1] The Government entered into a non-prosecution agreement with the CI in connection with the CI's participation in Elia's scheme to evade taxes and to report taxes due and owing and the CI's failure to report to the IRS a portion of the CI's wages from Elia, for the years 1999 through 2002, that were paid in cash.

Sneaker Outlet, Sports Stop and Sneaker Mania Women and Kids all
sell sneakers and sports apparel.  Dynasty and Final Touch Jewelry
sell jewelry, purses and accessories and Pizza Mania is a small
pizza restaurant.

       7.  In addition to bookkeeping duties, the CI was also
responsible for making sure that inventory was received from
suppliers and the suppliers' bills were paid, among other things.
As part of the CI's duties, the CI faxed letters, made phone calls
relating to the businesses and opened mail.  As such, the CI
acquired significant knowledge of Elia's operation of his
businesses.  In addition to the CI's bookkeeping and other
administrative duties, the CI also was responsible for collecting
rent on Elia's behalf from tenants of a rental building that Elia
owns in Yonkers, New York.  In or about February 2003, the CI
resigned from working as a bookkeeper for Elia but continues to
collect rent on Elia's behalf from the tenants of the Yonkers
rental building.  Thus, the CI regularly goes to the PREMISES #1
to drop off rent checks.

       8.  According to the CI, while the CI worked for Elia
as a bookkeeper, Elia generally collected cash and credit card
receipts from each of his stores, every day.  He placed the cash
and credit card receipts into separate envelopes for each store
and wrote a summary of the cash and credit card sales on the back
of each envelope.  He brought the envelopes, containing the cash
and receipts, to the PREMISES #1.  Elia removed the cash from the

envelopes and gave the envelopes with the credit card receipts to the CI.

9.    Based on the written summary on the outside of the envelope, the CI entered the total sales for that day in each business' ledger.  In separate columns, the CI also recorded the total daily credit card sales by credit card company for each store that accepted credit card payments.  Thus, each businesses' ledger accurately lists the daily total gross receipts and the daily credit card receipts by credit card company.  Accordingly, the total daily cash receipts can be determined by subtracting the credit card sales receipts from the total gross receipts.

10.   According to the CI, the stores' credit card income was directly deposited into corporate bank accounts through settlements issued by the credit card companies.  According to the CI, most of the cash generated from Elia's businesses, which Elia removed from the envelopes containing the daily receipts, was not deposited into the corporate bank accounts.

11.   The CI provided copies of one account statement from each of two corporate accounts used by Elia at HSBC.  The first account, entitled Sneakerama, Inc., DBA Sneaker Mania, according to the CI, contains deposits of three stores: Sneaker Mania, Sneaker Outlet and Sneaker Mania Women and Kids.  The second account, entitled Sports Stop Inc., according to the CI, contains deposits of the two Sports Stop stores.  The account statements, which cover the period of time from mid-December 2002

through mid-January 2003, corroborate the CI in that there are deposits of numerous credit card settlements and only a few cash deposits in small amounts.

12.   I have also obtained, from HSBC, additional account statements for those two accounts and a third account, entitled Final Touch Jewelry Inc.  The Sports Stop Inc. statements span the period April 2002, when the account was opened, through October 2003 and the Sneakerama statements cover the period November 2002, when the account was opened, through October 2003.  The Final Touch Jewelry statements cover the period March 2002, when it was opened, through October 2003.  These statements also reflect deposits coming almost entirely from credit card settlements.

13.   According to the CI, rather than depositing the cash receipts into the corporate business accounts, Elia used some of the cash to purchase postal money orders to pay business expenses, which is discussed in paragraph 19 below, and much of the cash went towards Elia's personal use.  For example, according to the CI, Elia held a brokerage account at Charles Schwab that was in the name of a brother, Samyr Elia, but over which Elia is the signator.  The CI recalled that Elia wire transferred money from that account to Israel.

14.   I have reviewed copies of records obtained from Charles Schwab which indicate that Elia's brother, Samyr Elia, is the account holder of an account at Charles Schwab; Samyr Elia is a citizen and resident of Israel; Yehezkel Elia has power of

7

attorney over the account; and, all correspondence relating to the account, including account statements, are sent to Samyr Elia, Sneaker Mania Inc., 6 Xavier Drive, Yonkers, NY 10704, to the attention of Yehezkel Elia.  The records also indicate that in June of 2002, Elia instructed Charles Schwab to wire in excess of $100,000 to bank accounts in Israel, one of which was an account on which Yehezkel Elia was the named beneficiary.

15.  In another example of how Elia was using the cash proceeds from his stores, the CI recalled that during a summer when the CI was employed as Elia's bookkeeper, Elia traveled to Israel.  Elia told the CI that when he went to the airport, he had about $35,000 in cash in his briefcase that he forgot about; the x-ray machine at the airport picked it up; and he got into trouble with Customs.  United States Customs Service records indicate that in or about July of 2001, Elia was caught in an outbound examination at JFK Airport by customs agents who seized $43,992 from Elia when Elia failed to declare the cash.

### The Books and Records

16.  I have examined handwritten ledgers, kept by the CI in the CI's capacity as Elia's bookkeeper, which reflect the total sales and sales by credit card for each location covering various periods of time from in or about March 2001 through in or about December 2002.  I have also reviewed a summary of calendar year sales broken down by month and by business location for the calendar years 2001 and 2002, which was also prepared by the CI,

8

upon instructions from Elia during the course of the CI's employment as his bookkeeper.

17. I have also reviewed certain tax returns and IRS records relating to the various businesses owned by Elia. With the exception of Pizza Mania, which filed tax returns on a calendar year basis, the other businesses filed tax returns based on a fiscal year with different ending months. In the case of Pizza Mania Inc., the records provided by the CI reflect annual sales in excess of $470,000 for the calendar years 2001 and 2002. The Pizza Mania tax returns report gross receipts of $217,761 for 2001 and $221,655 for 2002. In the case of Sneaker Mania Inc., the records provided by the CI reflect annual sales in excess of $2,300,000 for the twelve month periods ending in December 2001 and December 2002. Sneaker Mania Inc.'s tax returns for the period 1999 through 2002, for fiscal years ending in October, report that the highest amount of gross receipts for any of those twelve month periods was $1,579,233. In the case of Final Touch Jewelry Inc., the records provided by the CI reflect annual sales in excess of $320,000 for the twelve month periods ending in December 2001 and December 2002. Final Touch Jewelry's tax returns for the period 1999 through 2002, for fiscal years ending in March, report that the highest amount of gross receipts for any of those twelve month periods was $111,451. Accordingly, in the case of all three businesses, the gross receipts reported on the

9

tax returns is substantially less than that reflected in the records of the businesses provided by the CI.

18. In addition to the records described above, the CI also provided sales records for businesses identified as Dynasty, Sneaker Outlet and Sneaker Mania Women and Kids, all of which had substantial sales between January 1, 2001 and December 2002. Thus far, no separate tax returns for these entities have been located nor have taxpayer identification numbers been identified. Therefore, either sales from those three businesses have gone completely unreported, or, they may have been consolidated into the tax returns of Sneaker Mania and Final Touch Jewelry, since, to the best of the CI's understanding, Sneaker Outlet and Sneaker Mania Women and Kids share Sneaker Mania's bank account and Dynasty shares Final Touch Jewelry's bank account. If that is the case, the reported gross receipts on Sneaker Mania's and Final Touch Jewelry's tax returns are under-reported by even greater amounts.

19. According to the CI, some of the vendors who supplied the stores with merchandise were paid by check but most were paid with postal money orders. The CI also provided copies of accounts payable records spanning April 2002 through January 2003, which record vendors' names, invoice numbers, invoice amounts, what portions of the invoices were paid by money orders or checks, and the dates paid. These records indicate that the majority of payments to suppliers was made by money order, rather

10

than checks drawn on a business checking account.  Based on my experience, I believe that paying for legitimate business expenses through money orders is not an ordinary business practice where, as here, the business has bank accounts with significant bank activity.  Thus, it appears that Elia's use of money orders is a way for him to conceal the extent of his business activities and thereby make it easier to understate his receipts.

### The U.S. Postal Service Records

20.  Based on my conversations with inspectors of the USPIS and documents provided by the inspectors, I have learned the following information, which corroborates the CI's assertion that Elia was paying his suppliers, in large part, using postal money orders, and supports my belief that Elia is trying to conceal the extent of his business activities:

21.  Between April 1996 and December 2002, at least 1,512 postal money orders having an aggregate value of $1,058,500 were purchased almost exclusively from post offices in White Plains.  Written on each of these money orders, in the portion of the money order indicating on whose behalf the payment is being made, is the name "Sneaker Mania" or variations thereof.  Many of the money orders are paid to the order of footwear manufacturers, including Nike and Timberland.

22.  On 116 dates between January 14, 2002 and December 24, 2002, 742 USPS money orders totaling $519,500.00 were

purchased from seven Postal Service facilities located within Westchester County, New York (the "Postal Money Orders").

23. All but six of the 742 Postal Money Orders were issued in the amount of $700.00, and each of the 742 Postal money orders list "Sneaker Mania, Inc." (or variations thereof) as the purchaser.

24. By payee endorsement, all of these 742 Postal money orders were processed for deposit into the bank accounts of various footwear vendors, commercial finance or real estate companies.

25. Based on the postal inspectors' review of these 742 Postal money orders, specifically their dates of sale, offices of issue and serial numbers, the Postal Money Orders appear to have been purchased in a structured manner in order to evade the reporting requirements as set forth in 31 U.S.C. § 5313 and the regulations promulgated thereunder.

26. In particular, on three of the 116 dates, 47 of the 742 Postal Money Orders, totaling $32,900.00 were purchased. Although the daily total purchase exceeded $10,000.00, no individual transaction exceeded $10,000. For example, on September 11, 2002, rather than purchasing $11,200 worth of money orders from one postal facility at one time, 16 Postal Money Orders, totaling $11,200.00, were purchased in four separate transactions of $2,800.00 each from four different Postal facilities.

27.   Under these circumstances, there is probable cause to believe that the 742 Postal Money Orders were purchased in a structured manner to evade reporting requirements in violation of 31 U.S.C. § 5324 and the regulations promulgated thereunder.

### Search Warrants

28.   Based upon my experience and that of my colleagues as investigators of violations of the Internal Revenue Code, I am aware that businesses such as Sneaker Mania, Inc. create, maintain on their premises, and/or store on computers, computer hard drives, computer disks, software and electronic files, documents and information  including:  (i)  books, cash receipts journals, cash disbursement journals, sales journals, purchase journals, payroll records, petty cash payment records, bank statements, canceled checks, computer-generated summaries of the above, and correspondence, which refer or relate to the earnings and/or expenses of the business, its shareholders, officers, and employees;  (ii)  contracts, estimates, bills, invoices, receipts, correspondence, inventories, and other documents regarding vendors; (iii)  Forms 940, 941, W-2, W-3 and 1099 of the IRS, and forms of the New York State Department of Taxation and Finance, which relate to the payroll, earnings, or taxes of the businesses, their shareholders, officers, and employees;  (iv)  federal tax returns of the businesses and their shareholders.

29.   According to the CI, Elia has a computer at the PREMISES #1 that had previously been used in his stores and that

13

computer therefore likely contains records from the stores.

Although Elia did not use the computer to create and maintain

accounting records while the CI was employed as a bookkeeper, the

CI is aware that since then, Elia has been loading accounting

software onto that computer.  In addition, Elia has a computer

system connected to the cash registers at the PREMISES #2 and #3

that maintains inventory, pricing and sales records, which,

according to the CI, has been in use for the past 2-3 years.

    30.  Based upon the foregoing and additional information

provided below, there is probable cause to believe that documents,

computers and other items containing evidence, instrumentalities

and fruits of the foregoing Federal crimes will be found in the

PREMISES described below:

**Sneaker Mania Inc.**
**Suite 803**
**6 Xavier Drive**
**Cross County Shopping Center**
**Yonkers, New York 10704**
**(The "PREMISES #1")**

    31.  The PREMISES #1 is located in Suite 803, 6 Xavier

Drive, Cross County Shopping Center, New York.  As described above

in paragraph 2(a), the PREMISES #1 is the administrative office

for Elia's stores.  It is where Elia's office is located, where

the CI worked as Elia's bookkeeper, and where the CI returns to

deliver to Elia the checks the CI picks up from Elia's Yonkers

tenants.  According to the CI, Elia maintains most of his business

records at the PREMISES #1.  When the CI worked as a bookkeeper,

Elia came to the PREMISES #1 at the end of each business day with

the envelopes containing the store receipts and the summaries of the daily sales, and those envelopes are kept at the PREMISES #1.

32.   In addition, according to the CI, an accountant hired by Elia came to the PREMISES #1 several times a month in order to compute sales tax, payroll tax and annual income tax and to compile tax returns on behalf of Elia's businesses.   Records used by the accountant are maintained at the PREMISES #1.

33.   Thus, the following records, among others, that are relevant to this investigation, are maintained at the PREMISES #1: envelopes containing monthly receipts from each store; the ledgers and documents recording the stores sales created and maintained by the CI; accounts payable ledgers; employee time cards; receipt copies of money orders used to pay merchandise suppliers and rent for the stores; tax returns, insurance records, and bank records. Finally, a safe where Elia stores cash is also present at the PREMISES #1.

34.   The CI last visited the PREMISES #1 on or about December 26, 2003 and observed that the business's records are kept in essentially the same manner as they were when the CI stopped acting as bookkeeper.   Based on all of the above, there is probable cause to believe that there will be found in the PREMISES #1 evidence, instrumentalities and fruits of the crimes described above.

Sneaker Mania Store, Including The Basement Storage Area
1BB Xavier Drive
Cross County Shopping Center
Yonkers, New York 10704
(The "PREMISES #2")

    35.  The PREMISES #2 is the Sneaker Mania store located at 1BB Xavier Drive, Cross County Shopping Center, in Yonkers, New York, including the basement storage space located beneath that store.  The basement storage area can be accessed by going through the Sneaker Mania store.  According to the CI, inside the Sneaker Mania Store, kept next to the cash register, is a book that lists receipts and matches up with the daily receipt envelopes.  Additionally, there is a computer system attached to the cash register that maintains inventory, pricing and sales records.  Inside the basement storage area, Elia maintains, among other things, bags containing older records, including daily and monthly receipt envelopes and daily receipts from all the stores.

    36.  The CI last visited the store portion of the PREMISES #2 on or about January 23, 2004 and did not observe any changes.  The CI was last in the basement area in March 2003, at about the time the CI stopped acting as bookkeeper.  Since this space was used as a storage area, there is probable cause to believe that the documents that were stored there at the time, have remained stored there in essentially the same condition.  Based on all of the above, there is probable cause to believe that there will be found in the PREMISES #2 evidence, instrumentalities and fruits of the crimes described above.

Sports Stop Store, Including The Basement Storage Area
17 Xavier Drive
Cross County Shopping Center
Yonkers, New York 10704
(The "PREMISES #3")

    37.   The PREMISES #3 is the Sports Stop store located at 17 Xavier Drive, Cross County Shopping Center, Yonkers, New York, including the basement storage space located beneath the store. The basement storage area can be accessed by going through the Sports Stop store.  According to the CI, in the store there is a computer system attached to the cash register which maintains inventory, pricing and sales records.  Records stored in the basement include, among other things, old bank statements, check stubs, check books, old money orders payable to Nike, as well as other records relating to Elias's businesses.

    38.   The CI was last inside the PREMISES #3 on November 21, 2003 and the records are being maintained in substantially the same manner as they were when the CI worked as bookkeeper.  Based on all of the above, there is probable cause to believe that there will be found in the PREMISES #3 evidence, instrumentalities and fruits of the crimes described above.

    39.   Based on these facts, there is probable cause to believe that records, information, and other items that may constitute evidence of violations of Title 26, United States Code, Section 7201 (income tax evasion); Title 26, United States Code, Section 7206 (1) (filing of false returns); and Title 31, United States Code, Section 5324 (structuring financial transaction),

will be located on all the premises. Therefore, I respectfully request that warrants be issued to enter the PREMISES #1, #2 and #3 and to search and seize from the PREMISES #1, #2 and #3, all documents and other property and things which constitute evidence or fruits of such violations, including the following, relating to Elia, Sneaker Mania, Inc., Sneaker Mania Women and Kids, Sneaker Outlet, Dynasty, Sports Stop, Pizza Mania, Final Touch Jewelry, Inc. and White Plains Driving School, DBA Center for Safety, relating to the tax years 1999 through the present:

a.    All records, including books, Articles of Incorporation, corporate resolutions, minute books, stock books, general journals, cash receipt journals, daily receipt envelopes, cash disbursement journals, sales journals, purchase journals, payroll records, payroll stubs, petty cash payment records, computer-generated summaries for the above, and correspondence, including correspondence to and from Paul Lenok, CPA;

b.    General ledgers and subsidiary ledgers including notes receivable, accounts receivable, accounts payable, notes payable, and closing ledgers;

c.    Bank Statements, deposit slips, withdrawal slips and canceled checks for all bank accounts, including all funds on deposit such as certificates of deposit and money market accounts;

d.    Receipt copies of money orders;

18

e.  Contracts, estimates, bills, invoices, receipts, correspondence, inventories, and other documents regarding vendors and or suppliers;

f.  All Federal income tax returns, Forms 1040, 1120, filed or not filed, and supporting work papers, summary sheets, and analyses used in the preparation of the tax returns;

g.  Forms 940, 941, W-2, W-3 and 1099 of the IRS, and any forms of the New York State Department of Taxation and Finance, which refer to or relate to the payroll, earnings, or taxes;

h.  All computers, computer hard drives, and data and information stored on computers, electronic files, disks, software, electronic storage devices (e.g., Zip, CD, DVD and floppy diskettes) and all other peripheral devices capable of storing information requested in (a)-(g) and (j) herein;

i.  All closed and/or locked containers containing the information requested in (a)-(g) and (j) herein;

j.  All other records regarding the failure to report income from Sneaker Mania, Inc., Sneaker Mania Women and Kids, Sneaker Outlet, Dynasty, Sports Stop, Pizza Mania, Final Touch Jewelry, Inc. and White Plains Driving School, Inc., DBA Center for Safety on the respective corporate tax returns and individual tax returns of the companies shareholders (26 U.S.C. Section 7201, 7206 (1)) and the structuring of financial transactions (31 U.S.C. Section 5324).

19

k.    Any and all records and documents in the Hebrew language, which after seizure will be translated to discern whether they contain the information set forth in (a) through (i) above, which documents, after translation, will be retained if they do contain such information and returned if they do not contain such information.

40.  In consultation with computer specialists trained and experienced in the search and seizure of computer data, I have learned that in order to properly conduct a search of computer systems and storage media, it may be necessary to remove the entire computer, its peripherals and attachments (including, for example, storage devices and media such as internal and external hard drives), the software and data to operate the computer systems, related instruction manuals and other documentation which contain directions and information concerning the operation of the computer systems and the software programs, and passwords so that the data can be imaged, copied, reviewed, and analyzed in the same computer environment in which it was created, used, and maintained.  This is true for the following reasons:

a.    <u>The volume of evidence</u>.  Computer storage devices (such as hard disks, diskettes, compact disks, tapes, etc.) can store the equivalent of thousands of pages of information.  In addition, a user may seek to conceal evidence of criminal activity by storing it in random order with deceptive file names, or even erasing the files.  It is possible under some circumstances to

20

retrieve files from the hard drive of a computer even once they have been erased. Searching authorities may thus be required to examine all the stored data to determine which particular files are evidence or instrumentalities of criminal activity. This sorting process can take weeks or months, depending upon the volume of data stored, and it may be impractical to attempt this kind of data analysis "on-site."

      b.   <u>Technical requirements</u>. Analyzing computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications. Thus, it is difficult to know prior to the search which expert possesses sufficient specialized skills to best analyze the system and its data. No matter which system is used, however, data analysis protocols are exacting scientific procedures, designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password-protected, or encrypted files. Since computer evidence can be extremely vulnerable to tampering or destruction (both from external sources or from destructive codes embedded in the system as a "booby trap"), a controlled environment is essential to its complete and accurate analysis.

      c.   <u>Analysis of Electronic Data.</u> The analysis of electronically stored data, whether performed on-site or in a

21

laboratory or other controlled environment, may entail any or all of several different techniques.  Such techniques may include, but are not limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); "opening" or reading the first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; or performing electronic "key-word" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

41.  If, after inspecting the input/output devices, system software, and pertinent computer-related documentation, it becomes apparent that these items are no longer necessary to retrieve and preserve the data evidence, such materials and/or equipment will be returned within a reasonable time.

42.  WHEREFORE, the deponent respectfully requests search warrants for each of the PREMISES described in this application, and closed compartments and closed containers therein, and for the items specifically detailed in RIDER A with respect to each of the PREMISES, pursuant to Rule 41 of the Federal Rules of Criminal Procedure.

Because this is an ongoing investigation, I respectfully

22

request that this Affidavit, and the accompanying search warrant be filed under seal.


HERBERT EIS
SPECIAL AGENT
INTERNAL REVENUE SERVICE


Sworn to and subscribed before me
this  20 day of February, 2004


UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

23