UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------- x
                                              :
UNITED STATES OF AMERICA          :
                                              :
           - v. -                             :
                                              :          07 Cr. 543 (KMK)
YEHEZKEL ELIA, and                 :
DAVID ELYAHO,                      :
                                              :
                                              :
           Defendants                :

------------------------------------------------- x


### GOVERNMENT'S MOTION IN LIMINE SEEKING
### THE ADMISSION OF PROOF AND PROFFER STATEMENTS


MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
300 Quarropas Street
White Plains, NY 10601


Cynthia K. Dunne
Seetha Ramachandran
Assistant United States Attorneys
      -Of Counsel-

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -- - - - - - - - - - - - - -- -x
UNITED STATES OF AMERICA

                             :

         - v -                                     07 Cr.  543 (KMK)

                             :

YEHEZKEL ELIA and DAVID ELYAHO,   :

              Defendants.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -- - -x

### GOVERNMENT'S MOTION IN LIMINE SEEKING
### THE ADMISSION OF PROOF AND PROFFER STATEMENTS

#### Introduction

      The Government respectfully submits this Motion and Brief to provide the Court and the

defense notice of certain evidence that the Government will seek to introduce at trial, and to request

a ruling in limine, prior to opening statements, on the admissibility of that evidence.  Specifically,

the Government seeks rulings (1) permitting the Government to use statements made by Yehezkel

Elia in proffers to rebut any evidence offered, or any arguments made on Elia's behalf, or to impeach

any testimony offered by Elia, that is inconsistent with the admissions that Elia made in his proffer

sessions with the Government; and (2) that certain proof is admissible to prove the defendants' intent

in the crimes charged.

#### Background

      This case involves a massive income tax fraud by Yehezekel Elia and his brother, David

Elyaho.  The proof at trial will demonstrate that Elia, though a series of corporate vehicles and

businesses, concealed his tremendous income and filed numerous false tax returns, principally by

reporting only the corporate credit card payments which were electronically posted into his corporate bank accounts (and which as a result could not be hidden).   Because his numerous corporations and stores (sneaker stores, a pizza parlor, a jewelry store and others) did tremendous cash businesses, and because he did not want to report that cash as income, he did not deposit the cash into his bank accounts.   Similarly, because his business purchases actually exceeded the amount of gross receipts that he reported on his corporate tax returns, he paid by check only enough of his business expenses to substantially minimize the income which was reported by his corporations.

Recognizing that he could not pay out over years much more than he reported that he had earned, Elia paid many vendors by money orders and postal money orders.  The evidence will show that Elia went to extraordinary means to defeat and to thwart the ability to readily ascertain his tax liability, on some occasions obtaining multiple money orders from multiple locations on the same dates, breaking down the denominations of the money orders, all so that he could avoid having the financial institutions file currency transaction reports, which in turn, would alert the IRS to the amount of cash he was handling.  The proof will show that over a five year period, Elia waited on line somewhere or another to purchase approximately $8,414,601.00 in money orders, at eleven different locations, creating approximately 12,000 separate financial transactions – all to avoid depositing cash into his bank account.  Often he traveled to three or more different locations to purchase money orders on a single day, in order to avoid hitting the threshold which would trigger the filing of a cash report at any one location.

Although his businesses were tremendously profitable, according to his tax returns Elia's companies had only minimal sales and purchased only a minimal inventory (which effectively

negated most of the income). In fact, Elia's stores were significant businesses with a tremendous volume of business and inventory, a tremendous profit margin, and generated huge cash earnings. While a large amount of the money orders went to purchase inventory for Elia's businesses, some money orders were used to pay personal expenses (college tuitions, property taxes and other personal bills) and other monies were invested in properties and accounts that he held and managed either out of the country or in the names of others, occasionally in the name of his brother Samyr, who is in Israel. The Government anticipates that the proof will establish that Elia occasionally had either a bag and/or a large grocery bag filled with hundreds of thousands of dollars of cash, which he often gathered from the safe at his corporate office. In fact, on 2004, when federal agents searched Elia's corporate premises, his safe contained over $100,000 in cash.

David Elyaho, Elia's brother, took part in the scheme by managing the day to day operations of Final Touch Jewelry, one of the profitable Elia companies that did business in the manner outlined above. In addition, when Elia was on vacation or out of town and unable to collect his daily cash receipts from his companies, David Elyaho filled in and collect the cash on his brother's behalf from the various Elia companies. The records of Final Touch were maintained with the records of the other Elia companies and the proof will show that most of the cash withdrawals from the businesses were contemporaneously chronicled in journals that the defendants maintained and aptly entitled "David's Book" and "Hezi's Book" ("Hezi" being Elia's nickname).

Count One of the Indictment charges Elia and Elyaho with conspiring to defraud the United States by impairing impeding, defeating and obstructing the lawful governmental functions of the IRS in the ascertainment, evaluation, assessment, computation and collection of individual income taxes. Counts Two through Thirteen charge Elia with attempting to evade the payment of income

taxes he owed to the Internal Revenue Service and owed by some of his corporate entities for the calendar years and/or fiscal years 1999 through 2002. Counts Fourteen through Seventeen charge Elyaho with attempting to evade a substantial part of the income and employment taxes he owed individually for the tax years 1999 through 2002. Counts Eighteen through Twenty Eight charge Elia with signing false individual and corporate tax years for calendar years and fiscal years spanning from 1999 through 2002.

**POINT ONE**
**Elia's Proffer Statements May Be Admissible**

### A. Elia's Proffer

On December 19, 2005, Elia and his current attorney, Jared Scharf, met with representatives of the United States Attorney's Office, and law enforcement agents of the Internal Revenue Service ("IRS"). At the outset of the meeting, Elia and his counsel were provided with and reviewed the standard proffer agreement used by the U.S. Attorney's Office in the Southern District of New York in connection with all meetings with defendants. Elia indicated that he understood its terms. Both Elia and Mr. Scharf then executed the agreement. (A copy of the proffer agreement is attached as Exhibit A). Among other things, the proffer agreement provided that the Government would not use Elia's proffer statements affirmatively in its case-in-chief at trial. The agreement also provided, however, that Elia waived "all rights" to object to the introduction of his admissions:

> to rebut any evidence or arguments offered by or on behalf of [Elia] (including arguments made or issues raised sua sponte by the District Court) at any stage of the criminal prosecution (including bail, trial, and sentencing).

(Ex. A).

4

During the proffer session, Elia admitted to all of the crimes charged in the Indictment. In particular, he acknowledged that he knew that he had not properly reported his income, he knew that his tax returns were false, and he knew that his cash transactions were not reflected on the corporate tax returns, however, he thought that he "might not get caught." (*See* Exhibit B). He annually told his accountant to prepare his corporate tax returns by utilizing his bank accounts (which do not reflect the cash transactions) and he annually gave the accountant a random number to report as his salary. Specifically , among other things, Elia stated in substance:

(1)     Elia did not report his income accurately and he admitted that his individual and corporate tax returns were not accurate.

(2)     Elia agreed to split the cash profits from Final Touch Jewelry with his brother, defendant David Elyaho. The cash split is recorded in David's book, which details their daily cash draws from that business.

(3)     Elia admitted that he picked up cash from his various businesses on a daily basis. He used the cash to purchase money orders, to pay himself and to pay some store employees who were paid off the books. Elia further admitted that he did not provide the details of those cash expenditures to his accountant for purposes of preparing tax returns.

(4)     Elia admitted that he knew that his tax returns did not reflect the cash that he took from his businesses on a daily basis, the cash he used to buy money orders, the cash that he used to pay his own salary or the cash that he paid to some employees who were paid off the books.

(5)     The amounts that are reflected on tax returns as his salary are numbers that he gave to the accountant, Paul Lenok, to report on those returns.

(6)     Elia did not provide his accountant with all of the documents that would be necessary to prepare accurate tax returns.

(7)     The gross sales and costs of goods sold reported on his corporate tax returns were numbers that were filled in by the accountant, on the basis of the transactions that went through Elia's corporate bank accounts.

(8)     Elia knew that his tax returns were not accurate and he said nothing and did nothing to correct them. He thought that he "might not get caught."

5

(9)    Elia gave David Elyaho a small salary and a W-2 from PizzaMania so that David could get health insurance for his family on the group plan.

A copy of the Government's notes of the proffers are attached herein as Exhibit B.

The Government asks that this Court enforce the proffer agreement's provision governing the Government's ability to use the defendant's proffer statements to rebut any and all statements or arguments made by Elia or by Elia's counsel on Elia's behalf at trial that are inconsistent with the truth.

**B.    Admissibility of Proffer Statements**

**1.    General Legal Principles**

Although statements made during plea negotiations are inadmissible, see Fed. R. Evid. 410; Fed. R. Crim. P. 11(e)(6), the Supreme Court has held that a defendant may waive the right to prevent their use without raising any question of any violation of constitutional magnitude, as long as the waiver was knowing and voluntary. United States v. Mezzanatto, 513 U.S. 196 (1995). In Mezzanatto, the Court held that the protections in those rules are waivable for purposes of impeachment or rebuttal since "[a] criminal defendant may knowingly and voluntarily waive many of the most fundamental protections afforded by the Constitution." Id. at 201.

Agreements between the Government and a criminal defendant are "interpreted according to principles of contract law." United States v. Gregory, 245 F.3d 160, 165 (2d Cir. 2001) (cooperation agreement); United States v. Liranzo, 944 F.2d 73, 77 (2d Cir. 1991) (proffer agreement). Agreements between a defendant and the Government are "unique contracts in which special due process concerns for fairness and the adequacy of procedural safeguards obtain," United States v. Ready, 82 F.3d 551, 558 (2d Cir. 1996), so courts "resolve any ambiguities in the

agreement against the government." United States v. Rodgers, 101 F.3d 247, 253 (2d Cir. 1996). Nevertheless, such agreements should be enforced as "to give effect to the intent of the parties." United States v. Liranzo, 944 F.2d at 77.

The Second Circuit has specifically held that proffer agreements containing provisions identical to those contained in the agreement Elia executed are entirely enforceable. United States v. Velez, 354 F.3d 190 (2d Cir. 2004); see also United States v. Gomez, 210 F. Supp. 2d 465 (S.D.N.Y. 2002); United States v. Hanania Nicholas, S2 03 Cr. 1131 (JES). Indeed, Velez held that argument alone could trigger these proffer agreement provisions.

In Velez, the Second Circuit cited with approval United States v. Gomez, 210 F. Supp. 2d 465 (S.D.N.Y. 2002), in which Judge Chin engaged in a thorough analysis of the enforcability of the precise question raised here. See Velez, 354 F.3d at 195-196. Judge Chin gave five reasons why proffer agreement identical to the one signed by Marrero are enforceable. First, "as long as a defendant enters into a proffer agreement knowingly and voluntarily and the terms of the proffer agreement are clear and unambiguous, fairness dictates that the agreement be enforced." Id. at 475. Second, "plea bargaining and cooperation should be encouraged" and "[p]rosecutors will be reluctant to enter into cooperation agreements if they cannot obtain some assurance that the defendant will tell the truth, and if a defendant knows that his statements cannot later be used against him (unless he testifies), he may be more likely to embellish and lie during the proffer sessions." Id. Third, "although the Government does have significant bargaining power in these situations . . . it is the defendant's guilt and the availability of evidence to prove his guilt that creates the disparity in bargaining power." Id. at 476. Thus, as Judge Chin recognized, "this disparity is no basis for holding the agreement unenforceable." Id. Fourth, "defense counsel are able to put on a

meaningful defense without opening the door to the admission of proffer statements. [D]efense counsel are certainly able to challenge the credibility of the Government's witnesses and the weight and sufficiency of the Government's evidence." Id. Fifth, "enforcement of a proffer agreement does not preclude defense counsel from taking a position or presenting evidence inconsistent with a defendant's proffer statements." Id. The proffer agreement only allows the Government to rebut such arguments with defendant's own words. Id.

Relying almost entirely upon Judge Chin's reasoning in Gomez, the Second Circuit in Velez concluded that "where a proffer agreement is entered into knowingly and voluntarily, a provision in which defendant waives his exclusionary privilege under Federal Rule of Evidence 410 by permitting the Government to introduce defendant's proffer statements to rebut contrary evidence or arguments presented by the defense, whether or not defendant testifies, is enforceable." Velez, 354 F.3d at 196.        **2. Discussion**

Under the proffer agreement, counsel for Elia is free to argue that the Government has failed to prove its case beyond a reasonable doubt (or failed to present "credible" evidence) and is also free to cross-examine government witnesses on their recollection of events. See United States v. Maynard, 232 F. Supp. 2d at 40; United States v. Velez, 354 F.3d at 196. Elia's counsel may not contend, however, among other things: 1) that Elia did not know that his individual and corporate tax returns were false; 2) that Elia was not responsible for the filing of false tax returns; 3) that Elia and Elyaho did not attempt to hide their cash income from Final Touch Jewelry; 4) that Elia did not attempt to hide his own cash income from Final Touch and his other corporate entities; or 5) raise any argument or assertion that either directly or indirectly contradicts the facts, as outlined above,

that Elia admitted in his proffer session, without triggering the terms of the proffer agreement.  As

the Court in <u>Mezzanatto</u> stated:

> Under any view of the evidence, the defendant has made a false statement,
> either to the prosecutor during the plea discussion or to the jury at trial;
> making the jury aware of the inconsistency will tend to increase the
> reliability of the verdict without risking institutional harm to the federal
> courts.

513 U.S. at 205.

The Government, therefore, under the express terms of the proffer agreement, would have

a right and a duty to this Court to rebut any arguments that contradict the defendant's admissions.

As the principles outlined above make clear, to permit Elia to present evidence, make arguments,

or conduct lines of cross-examination that are contrary to his proffer at any time during the trial —

without also permitting the jury to assess that evidence in light of Elia's proffer — would thwart the

truth-seeking purpose of a trial and would be tantamount to a fraud on the jury and the court.  <u>See</u>

<u>Gomez</u> 210 F. Supp. 2d at 476.[1]

## POINT TWO

### The Admissibility of Anticipated Trial Proof

The Government anticipates that the proof at trial will encompass conduct that reached far

before the tax years charged and that continued after the tax years charged in the Indictment-- the

scheme was the defendants' long-standing business and personal practice.  As one might expect in

a case that charges evasion and a *Klein* conspiracy to impair and impede the collection of taxes, the

Government anticipates that the proof will show that while the defendants deliberately concealed

---

[1] Thus, if Elia's counsel were to make contrary arguments in summation that triggered the
terms of the proffer agreement, the Government would request that the proof be reopened to permit
the Government to present evidence of Elia's admissions in the proffer session.

their cash transactions and income from the IRS, at the same time they reported to various financial institutions and vendors that their incomes were substantially higher.  In addition, the Government anticipates that the proof will show, among other things, that Elia hid cash in foreign banks and brokerage accounts and in the names of others; Elia attempted to leave the country with a suitcase full of cash; and Elia had hundreds of thousands of dollars of cash (sometimes in a large brown grocery bag) that he used to purchase property or to invest in the names of others.  In addition, the government anticipates that the proof will show that Elia instructed others to structure his cash transactions, in order to avoid the filing of Currency Transaction Reports by any financial institutions, in order to hide his cash earnings.   Although all such proof is part and parcel of a scheme to defraud and to evade taxes, the Government anticipates that the defendants may contend that such proof is either "similar act proof" or overly prejudicial.

## A.  Governing Legal Standards

### 1. *Res Gestae* Evidence

Evidence that establishes the crimes charged in the Indictment  is admissible without regard to Rule 404(b) because it is part of the *res gestae*, and is thus not evidence of other acts at all. Accordingly, as the Second Circuit has recently stated, acts "inextricably intertwined with the charged conduct [are] not subject to Rule 404(b)."  United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000); see United States v. Miller, 116 F.3d 641, 682 (2d Cir. 1997) (where, as here, "the indictment contains a conspiracy charge, 'uncharged acts may be admissible as direct evidence of the conspiracy itself.'") (internal citation omitted); United States v. Frank, 11 F. Supp. 2d 314, 316 (S.D.N.Y. 1998) (Cote, J.) ("Evidence of uncharged criminal activity is not even Rule 404(b) evidence if it '. . . is inextricably intertwined with the evidence regarding the charged offense, or if

it is necessary to complete the story of the crime on trial.'") (quoting United States v. Gonzalez, 110 F.3d 936, 942 (2d Cir. 1997)).

**2. Rule 404(b)**

Evidence of a person's "[o]ther crimes, wrongs, or acts" is admissible under Federal Rules of Evidence 404(b) and 403 if such evidence is relevant to an issue at trial other than the defendant's character, and if its probative value is not substantially outweighed by the risk of unfair prejudice. See, e.g., Huddleston v. United States, 485 U.S. 681, 685-88 (1988); United States v. Jaswal, 47 F.3d 539, 544 (2d Cir. 1995)(per curiam). Evidence meeting these standards is "prejudicial in the sense that evidence should be prejudicial, and not in an improper way." United States v. Myerson, 18 F.3d 153, 166-67 (2d Cir. 1994) (quoting District Court in approving admission of Rule 404(b) evidence in tax case).

The Second Circuit has consistently followed an "inclusionary approach" to Rule 404(b), under which "evidence of prior crimes, wrongs, or acts is admissible for any purpose other than to show a defendant's criminal propensity," United States v. Lasanta, 978 F.2d 1300, 1307 (2d Cir. 1992) (emphasis in original) (internal quotation omitted); see United States v. Carboni, 204 F.3d at 44; United States v. Bok, 156 F.3d 157, 165 (2d Cir. 1998), including, among others, "opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b). "Where a defendant claims that his conduct has an innocent explanation, prior act evidence is generally admissible to prove that the defendant acted with the state of mind necessary to commit the offense charged." United States v. Zackson, 12 F.3d 1178, 1182 (2d Cir. 1993).

> Rule 404(b) does not require that the Government present its case to the jury stripped of all relevant information about the defendant that suggests prior bad acts. It requires only that the Government not

11

> invite the jury to infer guilt on the basis of the jury's estimation of the
> defendant's propensity for . . . criminal acts.

United States v. Frank, 11 F. Supp. 2d at 320.

The "plan" exception in Rule 404(b) adverted to above includes "evidence introduced . . . 'to complete the story of the crime on trial by proving its immediate context of happenings near in time and place.'" United States v. O'Connor, 580 F.2d 38, 41 (2d Cir. 1978) (quoting McCormick, Evidence § 190 (2d ed. 1972)). This "broad definition of plan" includes crimes or acts "inextricably interwoven with the charged crime." United States v. Levy, 731 F.2d 997, 1004 (2d Cir. 1984). Rule 404(b) evidence of "[o]ther crimes, wrongs, and acts" is admissible on the Government's case-in-chief to prove intent where the defense has already placed intent in issue. See Bok, 156 F.3d at 166; United States v. Inserra, 34 F.3d 83, 90 (2d Cir. 1994); United States v. Zackson, 12 F.3d at 1183.

### 3. Fed. R. Evid. 403

Rule 403 gives district courts discretion to exclude evidence only if its probative value is "substantially outweighed by the danger of unfair prejudice" to the defendant. Fed. R. Evid. 403 (emphasis added). As the Second Circuit has explained:

> To be sure, all evidence incriminating a defendant is, in one sense of the term, "prejudicial" to him: that is, it does harm to him. In that sense, the more pertinent evidence is, the more prejudicial it is. What "prejudice" as used in Rule 403 means is that the admission is, as the rule itself literally requires, "unfair" rather than "harmful."

United States v. Jimenez, 789 F.2d 167, 171 (2d Cir. 1986); see United States v. Diaz, 878 F.2d 608, 615 (2d Cir.), cert. denied, 493 U.S. 993 (1989); see also Oregon v. Kennedy, 456 U.S. 667, 674 (1982) ("Every act on the part of a rational prosecutor during a trial is designed to 'prejudice' the defendant by placing before the judge or jury evidence leading to a finding of his guilt"). "Unfair"

12

prejudice is that "tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." United States v. Gilliam, 994 F.2d 97, 100 (2d Cir.) (quoting United States v. Figueroa, 618 F.2d 934, 943 (2d Cir. 1980)); see also United States v. Ebner, 782 F.2d 1120, 1126 (2d Cir. 1986) (upholding admission of evidence against Rule 403 challenge in light of limiting instructions and "presumption that juries will follow [them]") (quoting Watkins v. Sowders, 449 U.S. 341,347 (1981)).

### 4. The Applicability Of The Rules To Criminal Tax Cases

The Second Circuit has routinely approved the admission of evidence of similar crimes, including uncharged tax crimes, in tax cases where the defense has put intent in issue. See Bok, 156 F.3d at 165-66 ("As we have often explained, a defendant's past tax-paying record is admissible to prove willfulness circumstantially . . . [evidence of defendant's failure to file personal and corporate state income tax returns for years prior to prosecution years is] "indicative of an intent to evade the tax system"); United States v. Myerson, 18 F.3d at 165-66 (where defendant claimed that charged transactions not motivated by desire to cheat on taxes, evidence of other similar transactions admissible under Rule 404(b)); United States v. Oshatz, 912 F.2d 534, 541-543 (2d Cir. 1990) (ample evidence defendants knew uncharged tax schemes were fraudulent, so proper to admit evidence of them under Rule 404(b)); United States v. Collorafi, 876 F.2d 303, 305 (2d Cir. 1989) (reversing district court's exclusion of state-of-mind evidence and noting that because prosecutions for tax evasion and failure to file a tax return require proof by the Government that the acts were done wilfully, "trial courts should follow a liberal policy in admitting evidence directed towards establishing the defendant's state of mind"); United States v. Turoff, 853 F.2d 1037, 1045-46 (2d Cir. 1988) (evidence of concealment of corporate revenues admissible to show intent to commit

13

charged tax fraud with respect to personal returns); United States v. Ebner, 782 F.2d at 1126 n.7 ("jury may consider evidence of intent to evade taxes in one year as evidence of intent to evade payment in prior or subsequent years"); United States v. Magnus, 365 F.2d 1007 (2d Cir. 1966) (holding that prior state taxpaying history was admissible and probative of wilfulness in failing to pay federal taxes in later years charged in indictment charging failure to pay federal income taxes); United States v. O'Donnell, 02 CR 411 (CM), slip op. (S.D.N.Y., May 2, 2003) (evidence of failure to file state returns admissible on issues of knowledge, intent, and willfulness); see also United States v. Johnson, 893 F.2d 451, 453 (1st Cir. 1990) (in prosecution for tax evasion for years 1982 through 1986, evidence of defendant's failure to file 1987 income tax return relevant to "show willfulness and absence of mistake"); United States v. Serlin, 707 F.2d 953, 959 (7th Cir. 1982) (in prosecution for failure to file 1976 and 1977 income tax returns, evidence of defendant's failure to file 1978 tax return "relevant to the issue of willfulness"); United States v. Farris, 517 F.2d 226, 229 (7th Cir.) (evidence of defendant's failure to file tax returns for 1972 and 1973 admissible in prosecution for failing to file tax returns for years 1969, 1970 and 1971); United States v. Upton, 799 F.2d 432, 433-34 (8th Cir. 1986) (in case charging failure to file tax returns for years 1980 and 1981, evidence of defendant's questionable compliance with tax laws "both in years prior to and subsequent to 1980-81, is probative of willfulness"); United States v. Farber, 630 F.2d 569, 572 (8th Cir. 1980) (1975 tax return admissible in prosecution for failure to file 1974 return as "subsequent tax paying conduct is relevant to the issue of intent or willfulness in a prior year"); United States v. Luttrell, 612 F.2d 396, 397 (9th Cir. 1980) (in case charging failure to file tax returns for 1974 and 1975, trial court did not abuse its discretion in admitting evidence that defendant did not file timely income tax returns for years 1976, 1977, and 1978).

14

The reason for allowing 404(b) proof in criminal tax cases is plain: one of the critical facts that the Government must establish at trial is that the defendant's tax conduct — be it an attempt to evade or defeat a tax, or the filing of a false returns —  was "a voluntary, intentional violation of a known legal duty," Cheek v. United States, 498 U.S. 192, 201 (1991), and not the result of an accident or good faith mistake regarding the requirements of the federal tax laws.

Accordingly, evidence of a defendant's other tax crimes — including failure to file returns or filing other false returns — is highly probative of wilfulness with respect to the crimes charged.  More particularly, 404(b) evidence is probative of wilfulness because it shows that a particular defendant's alleged violation of the federal tax laws was an intentional violation of a known legal duty and not due to inadvertence, mistake, or confusion as to what was required by the federal tax laws.  It also tends to establish that a defendant's conduct with respect to his federal taxes was motivated by a desire to evade the obligations imposed by the tax laws (including the requirements to file accurate returns and to pay taxes), and was part of a plan to accomplish that result.

## B.  Discussion Of  Anticipated Proof

### 1.    Tax Fraud Carried Out Through Elia's other businesses

The Government anticipates that the proof will show that Elia utilized all of his businesses and accounts, collectively, in a manner designed to hide and disguise his substantial cash earnings. Other Elia entities involved in the scheme charged include Sports Stop, Cross County Electronics, Photo Express and the White Plains Driving School.  The Government anticipates that the proof will show that Elia operated these other businesses in the same manner that he operated Sneaker Mania,

Pizza Mania, and Final Touch, and that they all collectively facilitated the concealment of the source and extent of his income and, likewise, the volume of his corporate expenses.

The Indictment charges David Elyaho with crimes relating to his hiding of income from Final Touch Jewelry. The Government intends to offer evidence that Elyaho filled in for Elia at his other businesses when Elia was out of town, by among other things, traveling from store to store on a daily basis to collect the cash generated at each store.

Further, the Government anticipates that the proof will show that Elia and Elyaho falsely stated their income to the IRS for tax years pre- and post-dating the tax years charged in the Indictment.

The Government will offer this evidence as proof of the defendants' intent, knowledge, pattern of conduct with regard to the crimes charged and also as background to the conspiracy charged in the Indictment.

## 2. Structuring

The Government anticipates that the proof will show that Elia went to extraordinary means to hide the cash that was generated by his businesses and to avoid the filing of any currency transaction reports by postal or financial institutions. In fact, the proof will show that over a five year period, Elia waited on line somewhere or another to purchase over $8,000,000.00 in money orders, at eleven different locations, creating approximately 12,000 separate financial transactions – all to avoid depositing cash into his bank account. Often he traveled to three or more different locations to purchase money orders on a single day, in order to avoid hitting the threshold which would trigger the filing of a cash report at any one location. The Government will offer this

evidence as an overt act in furtherance of the charged crimes and as proof of his knowledge and intent.

Further, the Government anticipates that the proof will show that Elia took hundreds of thousands of dollars in cash –  from his safe located in his business premises  – and that he "invested" much of that cash in accounts and properties that he managed in the name of his brother, Samyr Elia, an Israeli citizen.  In order to get those funds into accounts in Samyr's name, Elia instructed others to deposit the funds through a series of deposits in amounts under $10,000, so that the banks would not file Currency Transaction Reports.

The Government will offer this proof as evidence of Elia's intent and knowledge and as overt acts of concealment.  It is hard to imagine more relevant proof of Elia's intent to evade his tax liability and to hide his assets.

### 3.  Taking Cash out of the Country

On July 25, 2001 Elia was stopped by the United States Customs Service, leaving JFK Airport to travel to Israel, with $43,992 in cash in his suitcase.  Prior to boarding the plane to Israel, Elia falsely told agents that he was carrying less than $10,000 in cash.  When agents found the cash, however, Elia was allowed to leave the country with some cash but the balance of the cash ($42,000) was seized by Customs, as probable contraband.  Elia thereafter filed a petition for the return of the seized cash in which he stated in part and substance that the cash was generated by his legitimate businesses.  As a result of that petition, Customs thereafter fined Elia $5,000 for making a false statement and returned the balance of the money to him in the form of a $37,000 check.

This highly relevant conduct – proof that Elia attempted to sneak cash out of the country – is classic proof of tax evasion and is admissible as evidence of intent, knowledge and is also an overt act of concealment.  Given the value of this evidence with respect to the crucial issue of whether the

charged tax violations were the result of 'a voluntary, intentional violation of a known legal duty,' or the result of an accident or good faith mistake, any danger of unfair prejudice does not "substantially outweigh" its probative value.  Indeed, compelling proof of criminal intent is almost always prejudicial.  The admissibility of such evidence is further justified by the fact that it is straightforward, would neither complicate nor add significantly to the length of the trial, and is critical to understanding the nature and the context of other evidence that will be offered at trial.

### Conclusion

For the forgoing reasons, if Elia or his representatives contradict Elia's statements at his proffer, the Government should be permitted to use Elia's proffer statements.  Further, the above anticipated trial proof is admissible because it will help the jury to understand and assess the central issue presented in the case -- the defendants' knowledge and intent regarding the tax fraud and conspiracy charges, as well as to contextualize the defendants' overall scheme and explain how they carried it out.

Dated:   White Plains, New York
            May 23, 2008

Respectfully submitted,

MICHAEL J. GARCIA
United States Attorney


By:   ___/s/  Cynthia K. Dunne___
        Cynthia K. Dunne
        Seetha Ramachandran.
        Assistant U.S. Attorneys

19

<u>CERTIFICATE OF SERVICE</u>

SEETHA RAMACHANDRAN deposes and says that she is employed in the Office of the United States Attorney for the Southern District of New York.

That on May 23, 2008, she served a copy of the attached Government's Sentencing Memorandum by ECF and Fed Ex:

Jared Scharf, Esq.
1025 Westchester Avenue, Suite 305
White Plains, NY 10604

Joseph A. Vita, Esq.
327 Irving Avenue
Port Chester, NY 10573

I declare under penalty of perjury that the foregoing is true and correct. 28 U.S.C. Section 1746.

_/s/_____
Seetha Ramachandran

Executed on:  May 23, 2008
              White Plains, New York